**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**MICHAEL HILL**, *et al.*,

      **Plaintiffs,**

      v.

**THE UNITED STATES DEPARTMENT
OF THE INTERIOR**, *et al.*,

      **Defendants.**

**Civil Action No. 22-1781 (JEB)**

---

<u>**MEMORANDUM OPINION**</u>

A federally recognized Indian tribe, the Crow (Apsáalooké) Tribe has lived in Montana for centuries. The water rights of the Tribe on its Reservation had been the subject of decades of litigation and negotiation. To end those fraught disputes once and for all, Congress enacted the Crow Tribe Water Rights Settlement Act in 2010, ratifying a compact that the Crow Tribe and the State of Montana had entered 11 years prior. The Act provided a variety of benefits to the Crow in exchange for waivers and releases of all claims for water rights that the Tribe or individual Indians could have asserted against the United States. Pursuant to the Act, those waivers and releases were to take effect once the Secretary of the Department of the Interior published in the Federal Register a statement of findings that specified conditions were met. In 2016, the Secretary published those requisite findings.

Almost six years later, amidst increasing water insecurity, several Tribal members who hold property on the Crow Reservation along with an association comprising such individuals filed this action. Challenging both the Secretary's publication of findings and the Act itself, they assert that the Government breached its trust responsibilities to Tribal members and violated the

Administrative Procedure Act, the Settlement Act, and the Due Process Clause of the Fifth Amendment.  While Plaintiffs do not claim that they have actually been deprived of access to water, they allege that their water rights have lost the senior priority date to which they are entitled.  That, in turn, has reduced the market value of their allotments and means that Plaintiffs could be forced to forgo their use of a given water source should shortages prove severe enough. Plaintiffs have, it seems, formulated this lawsuit in hopes that the Court will invalidate the Settlement Act, thereby restoring their senior-priority-date water rights, increasing the market value of their allotments, and guaranteeing that they will have access to water even during shortages.

The Government moves to dismiss, advancing both jurisdictional and merits arguments. First, it maintains that Plaintiffs lack standing because any injury to their water rights stems only from the Settlement Act itself and is therefore neither traceable to Defendants nor redressable in this action.  Second, Defendants say that Plaintiffs fail to state claims upon which relief could be granted.  While the standing questions prove close, the Court concludes that Plaintiffs have cleared the bar.  It nonetheless will grant the Motion to Dismiss in its entirety because the Court agrees that Plaintiffs' claims are all deficient in one respect or another.

I.    **Background**

A.  Factual and Statutory Background

Given the prolixity of the pleadings, the Court will not recite them chapter and verse.  It will, instead, limit its account to the history most relevant to the lawsuit at hand.

The Crow Tribe has about 11,000 members, almost three-quarters of whom live on the Crow Reservation in southern Montana.  See ECF No. 14 (Am. Compl.), ¶ 53.  Not long after the Reservation's establishment in the mid-nineteenth century, Congress enacted two statutes that

authorized land within it to be "allotted" to individual Indians.  See General Allotment Act of 1887, ch. 119, 24 Stat. 388; Crow Allotment Act of 1920, ch. 224, 41 Stat. 751; see also Montana v. United States, 450 U.S. 544, 548 (1981) (describing the statutory scheme).  Pursuant to those acts, "the bulk" of the Reservation was allotted to individuals.  See Am. Compl., ¶ 60.  Today, approximately 46% of Reservation land is allotted to members of the Tribe and held by the United States in trust for them, 10% is held in trust for the Tribe itself, and 44% has been purchased by non-Indians.  Id., ¶¶ 73–74.  Plaintiffs (or Allottees) in this case are eight Crow Tribal members who hold trust allotments on the Reservation — i.e., who are part of the 46% — and the Apsáalooké Allottees Alliance, an association of such individuals.  Id., ¶¶ 41–49.

The water rights of allottees like Plaintiffs have been heavily disputed for decades.  In 1975, the United States filed a lawsuit in federal court seeking a declaration of the water rights of the United States, the Crow Tribe, and allottees.  Id., ¶ 79.  Four years later, the State of Montana created a dedicated water court and established a commission "to negotiate settlements with Montana Indian tribes and federal agencies [that] claim federal reserved water rights within Montana to quantify those rights."  Id., ¶¶ 80–81 (citation omitted).

After over twenty years of negotiations, from which allottees were excluded, the Crow Tribe-Montana Compact finally emerged in 1999.  Id., ¶¶ 82–83; see Mont. Code Ann. § 85-20-901 (1999).  The Compact set forth a "Tribal Water Right" — i.e., "the right of the Crow Tribe, including any Tribal member" — to divert, use, and store certain Reservation waters.  See Am. Compl., ¶¶ 85–86.  To guide administration of the Tribal Water Right, it directed the Tribe to create a "Tribal Water Code."  Id., ¶ 107.  It also instructed the Tribe's Water Resources Department and the United States to give the State a "Current Use List" indicating all current uses of the Tribal Water Right.  Id., ¶¶ 93–94.

Congress ratified the Compact in 2010 by enacting the Crow Water Rights Settlement Act.  See Pub. L. No. 111-291, §§ 401–16, 124 Stat. 3097.  The Settlement Act provides that the tribal water rights described in the Compact "are ratified, confirmed, and declared to be valid" and shall be "held in trust by the United States for the use and benefit of the Tribe and the allottees."  Id. § 407(b)(1), (c)(1).  With respect to allottees, it confirms Congress's intent "to provide to each allottee benefits that are equivalent to or exceed the benefits allottees possess as of the date of enactment," taking into consideration a variety of factors.  Id. § 407(a).  It directs that "[a]ny entitlement to water of an allottee under Federal law shall be satisfied from the tribal water rights," and allottees "shall be entitled to a just and equitable allocation of water for irrigation purposes."  Id. § 407(d)(2)–(3).  The Act also authorizes hundreds of millions of dollars in federal appropriations for Crow water projects.  Id. §§ 405–06, 411, 414.

In exchange for the Tribal Water Right, funding for water projects, and other benefits, the Settlement Act provides that the "benefits realized by the allottees under [it] shall be in complete replacement of and substitution for, and full satisfaction of," the allottees' water-rights claims, including "any claims of the allottees against the United States that the allottees have or could have asserted."  Id. § 409(a)(2).  The Act, accordingly, "authorize[s] and direct[s]" the United States, "acting as trustee for allottees," to "execute a waiver and release of all claims for water rights within the Reservation . . . that the United States, acting as trustee for the allottees, asserted, or could have asserted" on their behalf.  Id. § 410(a)(2).

Those waivers and releases of claims did not, however, take immediate effect.  Instead, the Settlement Act ties their effective date to the Act's "enforceability date."  Id. § 410(b).  It defines the "enforceability date," in turn, as "the date on which the Secretary publishes in the Federal Register a statement of findings" that specified conditions have been met.  Id. § 410(e).

4

Those conditions include, among other things, that "the Montana Water Court has issued a final judgment and decree approving the Compact; or [] if the Montana Water Court is found to lack jurisdiction, the district court of jurisdiction has approved the Compact as a consent decree and such approval is final." Id. § 410(e)(1)(A); see id. § 403(7) (defining "final" for these purposes). The Act provides for its own repeal if the Secretary does not publish the required findings by March 31, 2016, or an "extended date agreed to by the Tribe and the Secretary." Id. § 415(1).

    Two years after the Settlement Act was enacted, the Montana Water Court issued a preliminary decree approving the Compact. See In re Crow Water Compact, 380 Mont. 168, 171 (2015); see Am. Compl., ¶ 164. Unhappy with the bargain struck in the Compact and the Settlement Act, a group of Crow Tribal-member allottees — some of whom are Plaintiffs here — objected. In re Crow Water Compact, 380 Mont. at 171. Contending that they "have reserved water rights appurtenant to their allotments, [which] . . . are separate from the reserved rights held by the Tribe," they complained that "they did not receive adequate notice of the proceedings leading to the Compact" and that "their interests in the Compact negotiations were not adequately represented by the United States." Id. at 171–72. In July 2014 and May 2015, respectively, the Water Court dismissed their objections and issued final approval of the Compact. Id. at 169, 172–74; In re Crow Water Compact, 382 Mont. 46, 48–49 (2015). The Montana Supreme Court subsequently affirmed both decisions. In re Crow Water Compact, 380 Mont. at 178; In re Crow Water Compact, 382 Mont. at 56. The allottees submitted a petition for certiorari to the Supreme Court of the United States, which it denied in April 2016. See 136 S. Ct. 1712 (2016).

    Apparently not content with state court as a forum, the same plaintiffs filed a putative class action in Montana federal court in 2014 while the state-court action was pending. See

Crow Allottees Ass'n v. U.S. Bureau of Indian Affs., No. 14-62 (D. Mont. May 15, 2014), ECF
No. 1 (2014 Class Compl.); Am. Compl., ¶ 168.  They claimed, among other things, that the
United States had breached its fiduciary duty to the Crow allottees during the Compact's
negotiations and had violated their due-process rights by failing to adequately represent them.
See 2014 Class Compl., ¶¶ 89–113.  The United States moved for judgment on the pleadings,
which the district court granted and the Ninth Circuit affirmed.  Crow Allottees Ass'n v. U.S.
Bureau of Indian Affs., 705 F. App'x 489, 491 (9th Cir. 2017), aff'g 2015 WL 4041303 (D.
Mont. June 30, 2015).  The allottees did not petition for certiorari, so that was that.  See Am.
Compl., ¶ 175.

On June 22, 2016 — which the careful reader will realize was after the state court
proceeding wrapped up but while the federal one was still ongoing — the Secretary of the
Interior published the statement of findings in the Federal Register, pursuant to the Settlement
Act.  See Statement of Findings: Crow Tribe Water Rights Settlement Act of 2010, 81 Fed. Reg
40,720 (June 22, 2016).  She found that the specified conditions in section 410(e) of the Act were
met, including that "[t]he Montana Water Court has issued a final judgment and decree
approving the Compact."  Id.  She also explained that on March 21, 2016, in advance of the
March 31, 2016, statutory deadline, "the Secretary and the Tribe agreed to extend the deadline
for publication to June 30, 2016."  Id.  And she announced that "[t]he publication of this notice
causes certain waivers and releases of claims to become effective as required by the Settlement
Act."  Id.

B.  The Current Action

On June 21, 2022, nearly six years after the Secretary's publication of the statement of
findings, Allottees filed this action against the Department of the Interior, Deb Haaland

(Secretary of the Department), and Bryan Newland (Assistant Secretary of the Department of the Interior for Indian Affairs).  See ECF No. 1 (Compl.).  They subsequently filed an Amended Complaint in which they named the United States as an additional defendant.  See Am. Compl.

That pleading, much like the history of the events giving rise to this lawsuit, is long and winding.  Allottees devote many pages to explaining that the "water use rights purported to be provided to Plaintiffs" by the Compact and the Settlement Act "were and are illusory" because they "can receive no actual benefits" absent a Tribal Water Code and Current Use List, which — they say — are nonexistent.  Id., ¶¶ 9–12, 15, 117–19.  Without a Tribal Water Code and a Current Use List, they explain, "there is no bona fide mechanism by which Plaintiffs can quantify and enforce their access to water as governed by the Compact and the Act."  Id., ¶ 14.  Plaintiffs do not contend that Defendants — or the Crow Tribe, for that matter — have actually deprived them of access to water, but rather assert that the cloud on their rights has diminished the market value of their allotments.  Id., ¶ 206.  What is more, they fear that "during times of shortage," non-Indians will be entitled to their full appropriation before Allottees.  Id., ¶ 15.

The four counts asserted in their Amended Complaint do not, however, pertain to those grievances.  Rather, Plaintiffs bring two counts under the Administrative Procedure Act, alleging that Interior violated the Settlement Act by "failing to properly extend" the deadline for publication of the statement of findings and prematurely publishing that statement.  Id., ¶¶ 183–91 (Count I); id., ¶¶ 192–96 (Count II).  In the third count, Allottees advance a breach-of-trust claim, asserting that Defendants breached their trust obligations to Plaintiffs.  Id., ¶¶ 197–209 (Count III).  Finally, Plaintiffs allege that the Government violated the Fifth Amendment by depriving them of procedural and substantive due process and equal protection.  Id., ¶¶ 210–14 (Count IV).  They ask the Court to invalidate the Settlement Act, thus restoring their senior-

priority-date water rights, increasing the market value of their allotments, and ensuring their access to water even in times of shortages.  Id. at 55–57.  Defendants now move to dismiss under Federal Rules of Civil Procedure 12(b)(1), for lack of jurisdiction, and 12(b)(6), for failure to state a claim.  See ECF No. 16 (MTD).

## II.    Legal Standard

When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must demonstrate that the court indeed has subject-matter jurisdiction to hear his claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion [also] imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 13–14 (citation omitted).  In policing its jurisdictional borders, the court treats the complaint's factual allegations as true and grants the plaintiff the benefit of all reasonable inferences.  See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Rule 12(b)(6), conversely, provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted."  In evaluating a motion to dismiss under that Rule, the court must "treat[s] the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted).  A court need not accept as true, however, "a legal conclusion couched as a factual

allegation." Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (citation omitted).  Although

"detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl.

Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual

matter, [if] accepted as true, to state a claim to relief that is plausible on its face," Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A plaintiff may survive a

Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the allegations "must

be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555–56.

### III.   Analysis

In seeking dismissal, the Government first contends that Plaintiffs lack standing because

their injuries are neither traceable nor redressable.  Next, it asserts that even if they have

standing, each of the four counts in the Amended Complaint is deficient.  The Court addresses

these arguments in turn.

### A.   Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to

resolving "Cases" or "Controversies."  U.S. Const. art. III, § 2, cl. 1.  A party's standing "is an

essential and unchanging part of the case-or-controversy requirement of Article III." Lujan, 504

U.S. at 560.  Standing therefore represents a "predicate to any exercise of [the court's]

jurisdiction." Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996).  To

establish standing, a plaintiff must show that she "(1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  A "deficiency

on any one of the three prongs suffices to defeat standing." U.S. Ecology, 231 F.3d at 24.  The

Court will run through each prong.

1. *Injury in Fact*

Plaintiffs must first demonstrate that they "have suffered an injury in fact — an invasion of a legally-protected interest which is (a) concrete and particularized, . . . and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (cleaned up).  Allottees' asserted injury here is the "diminishment of their water rights" under the Winters doctrine and the corresponding "diminishment" of "the value of their allotments."  Am. Compl., ¶ 17; see id., ¶¶ 206, 213; ECF No. 21 (Opp.) at 7.  A brief explanation of Indian water rights may aid the reader in understanding what that means.

The Supreme Court has long held that "the Federal Government's reservation of land for an Indian tribe also implicitly reserves the right to use needed water from various sources — such as groundwater, rivers, streams, lakes, and springs — that arise on, border, cross, underlie, or are encompassed within the reservation."  Arizona v. Navajo Nation (Navajo Nation II), 599 U.S. 555, 561 (2023).  That doctrine, which emerged in Winters v. United States, 207 U.S. 564, 576–577 (1908), is aptly called the "Winters doctrine" or the "reserved water rights doctrine."  Navajo Nation II, 599 U.S. at 561; see Cappaert v. United States, 426 U.S. 128, 138–39 (1976); Arizona v. California, 373 U.S. 546, 598–600 (1963).  When Reservation land is allotted to a member of the Tribe, the "right to use some portion of tribal waters essential for cultivation passe[s] to the owner[]."  United States v. Powers, 305 U.S. 527, 532 (1939); see Colville Confederated Tribes v. Walton, 647 F.2d 42, 50 (9th Cir. 1981) ("It is settled that Indian allottees have a right to use reserved water.").  That is, allottees acquire so-called Winters water rights.  Those rights are "more valuable than the rights of competing water users" because their priority date is the date the reservation was established.  See Am. Compl., ¶ 69 (quoting Walton, 647 F.2d at 51); Winters, 207 U.S. at 576.  Under the prior-appropriation doctrine, to which Montana has

long subscribed, an older priority date secures first access to water.  See Kelly v. Teton Prairie LLC, 384 Mont. 174, 178 (2016) (citing Mont. Code Ann. § 85-2-401(1)).

As landowners of Indian trust allotments on the Crow Reservation, Plaintiffs thus hold "real property interests in Indian Winters doctrine water rights appurtenant to their allotments." Opp. at 4; Am. Compl., ¶¶ 42–49, 70.  Those rights, Plaintiff assert, are "more valuable than the rights of competing water users" thanks to their priority date of 1868.  See Am. Compl., ¶ 69 (internal citation omitted).  And they were injured here insofar as the Government "placed [the] rights in limbo, placed a cloud on the title of all Indian trust allotments on the Crow Reservation, and materially reduced the market value of the Plaintiffs' and all Allottees' Winters Rights."  Id., ¶ 206; see id., ¶ 213 (alleging Defendants "attempted to cause an expropriation or diminishment of the Plaintiffs' and Allottees' valuable and marketable real property Winters Doctrine water rights"); Opp. at 7 (similar).

Defendants sensibly do not contest, and the Court agrees, that the alleged diminishment of Plaintiffs' Winters water rights is a sufficient injury under Article III.  Cardenas v. Smith, 733 F.2d 909, 913 (D.C. Cir. 1984) ("It is beyond cavil that the deprivation of one's property is a sufficient injury to satisfy the injury in fact requirement.").  Whether that injury is attributable to Defendants, however, is a much harder question — and the one to which the Court now turns.

2. *Traceability*

The Government asserts that Plaintiffs cannot show that their injury is "fairly trace[able] to" the conduct of the Department of the Interior, Haaland, or Newland — three of the four Defendants here.  Lujan, 504 U.S. at 560.  Rather, Defendants contend that "Plaintiffs' grievance . . . lies with Congress" because their "claimed injury" stems only "from the terms of the Settlement Act, which Congress enacted."  MTD at 13–14.

As the Government sees it, Allottees suffered no injury "traceable" to Interior's actions — agreeing to an extended date for publication of the statement of findings and subsequently publishing such statement — because "[e]ven if the Secretary had the authority to do so," neither of those actions "purported to waive or release potential claims." Id. Haaland's decision to agree to extend the publication deadline "simply expanded the time during which [she] could publish the statement of findings," and her later publication of it "simply determined the enforceability date of various provisions of the Settlement Act, including the waivers and releases." Id. "Any injury caused by the waivers and releases in the Settlement Act," the argument goes, "is thus wholly attributable to Congress." ECF No. 23 (Reply) at 3.

Plaintiffs rejoin that "there is nothing in the Act that results in an automatic diminishment or waiver of Plaintiffs' rights," meaning that "[t]he Act itself does not cause Plaintiffs' harm." Opp. at 10. Indeed, "[n]o waiver or diminishment automatically springs into effect." Id. Rather, "under the Act's plain terms, the waivers of Plaintiffs' Winters rights do not take effect at least until the enforceability date," which is "directly dependent" on Interior's publication of the statement of findings. Id. In other words, Allottees contend, publication of the statement of findings "activated" the "effective date and subsequent applications of the terms of the Act by Interior and various agencies of the executive branch of the federal government." Id. at 38; see id. at 18 (asserting that "the moment upon which Plaintiffs' Winters' water rights would have passed from their original state to the terms established in the . . . Settlement Act" was "triggered" by the publication of the statement of findings).

There is no doubt that, as the Government maintains, Allottees' underlying grievance lies mostly with Congress for enacting the Settlement Act. But at the end of the day, "[t]he causation standard for Article III standing is not particularly demanding." Garnett v. Zeilinger, 485 F.

Supp. 3d 206, 218 (D.D.C. 2020).  It requires neither that the defendant's conduct "be the most immediate cause" of a plaintiff's injuries nor "even a proximate cause" of them, but only that a plaintiff's "injuries be 'fairly traceable' to the defendant." Attias v. Carefirst, Inc., 865 F.3d 620, 629 (D.C. Cir. 2017).  The Court acknowledges that Congress "is a key player in the causal story" here insofar as it — not Interior — enacted the Settlement Act.  Orangeburg, S.C. v. FERC, 862 F.3d 1071, 1080 (D.C. Cir. 2017).  "But the existence of, perhaps, an equally important player in the story does not erase [Interior]'s role," id., which in this case was to "trigger[]" or "activate[]" the provision of law inflicting Plaintiffs' claimed injury.  See Opp. at 18, 38.  To be sure, the Secretary's role is less than that of an "equal[] player." Orangeburg, 862 F.3d at 1080.  But if the Secretary had not published the statement of findings, the waivers and releases would not have taken effect, and Plaintiffs would have suffered no injury.  See Settlement Act § 415.  While the issue is no slam dunk for Plaintiffs, they appear to narrowly get the ball over the traceability rim.

### 3.  *Redressability*

With two prongs down, there is still one to go.  Plaintiffs must also show that a favorable decision in this action would likely redress their injury.  Lujan, 504 U.S. at 561.  For many of the same reasons it asserts that Allottees' injury is not traceable to the challenged conduct, the Government contends that their injury is not redressable either.  Both analyses prove tricky; indeed, traceability and redressability "overlap as two sides of a causation coin." Dynalantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997).

Plaintiffs seek only one form of relief in this suit: declaratory relief.  Specifically, they ask the Court to "[a]ward[] the fees, costs and disbursements incurred in connection with this action" and to declare that: (1) the Secretary's publication of the statement of findings is "void

and unenforceable"; (2) the enforceability date of the Settlement Act is "void and unenforceable"; (3) the Act itself is "void and unenforceable"; (3) the Act "has been automatically repealed"; and (4) Plaintiffs are "not bound" by the Montana Water Court's final judgment and decree approving the Compact.  See Am. Compl. at 55–56.

Rather than focusing on the relief that Plaintiffs seek, the Government homes in on the remedies to which it thinks their claims might actually entitle them.  Those remedies, it contends, would not in fact redress their injuries.  See MTD at 14–18.  Starting with Allottees' APA claims, Defendants emphasize that the APA empowers courts only to "hold [agency action] unlawful and set [it] aside."  5 U.S.C. § 706(2); see Long Island Power Auth. v. FERC, 27 F.4th 705, 717 (D.C. Cir. 2022) ("Vacatur is the normal remedy under the APA . . . .").  But, the Government asserts, that remedy would be inadequate here because vacating Interior's challenged actions would not restore Plaintiffs' Winters water rights.  Pursuant to "the Settlement Act's plain terms, those waivers and releases have already taken effect."  MTD at 15.  Indeed, they took effect the moment the statement of findings was published.  Id.; see Reply at 5.  There is, therefore, "no relief under the APA that this Court could grant that would redress Plaintiffs' injuries," the Government says.  See MTD at 16.  Allottees' breach-of-trust and Fifth Amendment claims fare no better on the redressability front, according to Defendants, because "the only remedy likely to redress any such injuries is damages to compensate Plaintiffs for the alleged diminishment of their trust property," but Plaintiffs do not seek damages.  Id.

As Defendants see it, then, "the only remedy that could potentially redress Plaintiffs' injuries" would be invalidation of the Settlement Act.  See MTD at 17.  Yet, the Government asserts — without much by way of explanation — that the Court "could not consider that remedy without joining the Crow Tribe and State of Montana, the other signatories to the Crow Water

Compact, which the Settlement Act implemented, and whose legal rights and obligations would be directly affected by any finding that the Act is unconstitutional or otherwise unenforceable." Id. at 18.  In any event, the Government says, "[t]he result of 'a favorable decision on the merits' of Plaintiffs' claims" would not entitle them to invalidation of the Act.  See Reply at 6.

Plaintiffs, unsurprisingly, offer a different approach.  "A declaratory judgment by this court that the Act is void," they explain, would give them "exact redress for Interior's failed administration of the Act's requirements."  Opp. at 15.  That is because it would, among other things: "void[] the waivers and releases of their appurtenant Winters rights and all contracts connected with the Act"; "remove[] the cloud on the Plaintiffs' and other allottees' title"; "ensure[] that the Plaintiffs' extremely valuable, marketable, 1868 prior and paramount water rights priority remains intact and enforceable by priority call"; and "allow[] them to use their water (with or without a tribal water code), advance agricultural plans, lease or finance development projects on their land, or even sell their allotments with their appurtenant Winters rights."  Id.  According to Plaintiffs, voiding the Act would, therefore, "squarely address[] and remed[y]" their claims.  Id.

The Government's position carries force, but the Court again finds that Plaintiffs have alleged enough to show redressability, if just barely.  A number of the Government's arguments seem to go to the Court's Rule 12(b)(6) analysis of whether Allottees state a claim upon which relief can be granted, not its Rule 12(b)(1) inquiry into whether they have met the redressability requirement of standing.  See, e.g., MTD at 18 (arguing lack of redressability given that "the Constitution grants Congress plenary authority over Indian affairs, U.S. Const. art. I, § 8, cl. 3, and . . . the Settlement Act was a proper exercise of that authority and Plaintiffs have alleged no facts that would support a contrary finding").  But the question for purposes of redressability is

not whether Allottees have stated a claim that will likely entitle them to the relief they seek; it is whether "the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged."  Cnty. of Delaware, Pa. v. Dep't of Transp., 554 F.3d 143, 149 (D.C. Cir. 2009) (citation omitted); see Jafarzadeh v. Nielsen, 321 F. Supp. 3d 19, 34–35 (D.D.C. 2018) ("[T]he question whether relief is in fact available under federal law is not part of the redressability analysis . . . .  [A]ny assertion that [something] prohibits the Court from granting the relief sought is properly addressed when analyzing whether plaintiffs have 'state[d] a claim upon which relief can be granted.'") (first citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998); and then quoting Fed. R. Civ. P. 12(b)(6)) (emphasis in original).  The Court sees no reason, and Defendants give none, why the declaratory relief sought, assuming that the Court chooses to grant it, would not provide at least partial redress for Plaintiffs' injury.  See Uzuegbunam v. Preczewski, 141 S. Ct. 792, 801 (2021) ("[T]he ability to effectuate a partial remedy satisfies the redressability requirement.") (cleaned up).  Such relief would, at the very least, clear up title to their Winters water rights.

In sum, while their suit features a number of thorny standing questions, the Court believes that Plaintiffs have sufficiently established that subject-matter jurisdiction exists here.

B.  Merits

That said, the Government has other arrows in its quiver: it contends that all four of the causes of action in the operative Complaint do not state a claim for relief.  Agreeing in full, the Court will next discuss the counts and their deficiencies.

1.  *Administrative Procedure Act*

Counts I and II allege that the Secretary of Interior failed to properly extend the deadline for publication of the statement of findings, see Am. Compl., ¶¶ 183–91 (Count I), and

16

prematurely published that statement even though not all of the Settlement Act's conditions for publication were met, respectively.  Id., ¶¶ 192–96 (Count II).  In their Amended Complaint, Allottees frame both claims as alleging "violation[s] of the [Settlement Act]."  Id. at 48, 50 (typeface altered).  Because Plaintiffs do not argue that the Settlement Act creates a private right of action, however, the viability of these claims turns on whether Plaintiffs have adequately pled them under the APA.  El Paso Nat. Gas Co. v. United States, 750 F.3d 863, 890 (D.C. Cir. 2014); see MTD at 19 ("Plaintiffs' only avenue . . . is the APA."); see also Opp. at 17 (acknowledging that "[t]he APA is the vehicle for advancing claims under the Settlement Act").

The APA provides for judicial review of all "final agency action[s] for which there is no other adequate remedy in a court," 5 U.S.C. § 704, except when "statutes preclude judicial review," or the "agency action is committed to agency discretion by law."  Id. § 701(a)(1)–(2).  The "final agency action" requirement is a two-step threshold inquiry.  Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8, 13 (D.C. Cir. 2005).  First, there must be an "agency action," which is defined in the APA to "include[ ] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  Second, that action must be "final," meaning it must both "mark the consummation of the agency's decisionmaking process" rather than reach a conclusion "of a merely tentative or interlocutory nature," and it "be one by which rights or obligations have been determined or from which legal consequences will flow."  U.S. Army Corps of Eng'rs v. Hawkes Co., 578 U.S. 590, 597 (2016) (quoting Bennett v. Spear, 520 U.S. 154, 177–78 (1997)).

In alleging violations of the Settlement Act, Plaintiffs here invoke section 706(2) of the APA.  See Am. Compl., ¶¶ 2, 196.  That section authorizes courts to "hold unlawful and set aside agency action . . . found to be," among other things, "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law" or "in excess of statutory jurisdiction." 5 U.S.C. § 706(2)(A), (C). The Government contends that both Counts I and II are deficient.

a. Deadline Extension

As it is pled in the Amended Complaint, Count I challenges Interior's agreement with the Crow Tribal Chairman to extend the deadline for publication of the statement of findings from March 31, 2016, to June 30, 2016. See Am. Compl., ¶¶ 183–91. Recall that the Settlement Act calls for its own repeal if the Secretary does not publish the required findings by March 31, 2016, or by an "extended date agreed to by the Tribe and the Secretary." Settlement Act § 415(1). According to Allottees, the "power and authority" to agree to an extended date on behalf of "the Tribe" resides exclusively with the Crow Tribal General Council. See Am. Compl., ¶ 189. But here, the Secretary reached an agreement with the Crow Tribal Chairman who leads that Council — not the entire Council —to extend the deadline. Id., ¶ 187. Plaintiffs allege that because the Chairman lacks the "power and the authority to unilaterally" agree to an extension, the extension agreement is invalid. Id., ¶¶ 188, 191. In APA vernacular, Plaintiffs' claim seems to be that by entering the extension agreement with only the Chairman, Interior violated the Settlement Act and therefore acted contrary to law. See 5 U.S.C. § 706(2).

Defendants contend that Count I challenges no final agency action reviewable under the APA. See MTD at 19–22. They offer three independent reasons that the extension agreement is unreviewable. First, the Government says, "the Secretary's agreement to extend the deadline for publishing the statement of findings — via an exchange of written letters with the Tribe — was not agency action" because it neither constitutes a "rule, order, license, sanction, relief, or equivalent" nor determines the rights or obligations of any party. Id. at 20 (quoting 5 U.S.C. § 551(13)). Second, even if the extension agreement was an agency action, Defendants say, it

was not "final" because it neither "mark[ed] the consummation of any decisionmaking process with respect to the statement to be published" nor "itself impact[ed] anyone's rights or obligations." Id. at 20–21.  Last, the Government asserts that even if the extension agreement was a final agency action, it is "committed to agency discretion by law" because "the statutory text simply indicates that an extension may be agreed to by the Tribe and Secretary," providing "no standards that would guide this Court's review of that decision." Id. at 21–22.

Rather than contesting the non-reviewability of the extension agreement in their Opposition, Plaintiffs explicitly concede that the agreement is not a final agency action.  Even on Allottees' own admission, then, Count I — as pled in the operative Complaint — must be dismissed.  They further ignore — effectively conceding — the argument that the agreement is, in any event, committed to agency discretion.  See Opp. at 17–18; see also Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").  The issue is thus conceded twice over.

Refusing to accept their fate, Plaintiffs contend that Defendants' Motion to Dismiss misunderstands Count I.  See Opp. at 17–18.  Apparently, this cause of action does not target the extension agreement but rather Interior's publication of the statement of findings itself.  See id. at 17 ("[I]t is not the extension of the publication date that was the final agency action.  Rather, it was the June 22, 2016, publication of the Statement of Findings itself that was the final agency action."); id. at 18 ("[T]he final agency action for the purposes of judicial review is clearly the Publication of the [statement of findings].").

The Court is dubious of what seems to be an attempt to use the Opposition to rewrite the Amended Complaint.  Kingman Park Civic Ass'n v. Gray, 27 F. Supp. 3d 142, 165 n.10 (D.D.C. 2014) ("[I]t is well settled law that a plaintiff cannot amend its complaint by the briefs in opposition to a motion to dismiss."); see Am. Compl., ¶ 184 ("The Secretary's attempted extension of the Act's . . . deadline for publication of the Statement of Findings to establish the Act's Enforceability Date . . . was legally ineffective . . . ."); id., ¶ 191 ("The Secretary's attempted extension of the SOF publication deadline from March 31, 2016 to June 22, 2016, was void ab initio . . . .").  Even were the Court to accept Allottees' new characterization of Count I, it would still find inescapable the conclusion that they have not stated a claim under the APA. That is because they have not pled any factual allegations that could lead a reasonable court to conclude that Interior acted contrary to law by publishing the statement of findings on a date agreed to by the Crow Tribal Chairman, as opposed to by the entire Crow Tribal General Council.  As Plaintiffs acknowledge, the Settlement Act says nothing about who has the authority to agree to a deadline extension on behalf of the "the Tribe."  Settlement Act § 415.

Plaintiffs give only one reason for thinking that Interior's publication of the statement of findings on a date agreed to by the Chairman, instead of the entire Council, was unlawful: a resolution passed by the Crow Legislature in 2012, which Allottees attach to their Amended Complaint and incorporate by reference.  See Am. Compl., ¶ 152; ECF No. 14-1 (Resolution of Crow Tribal Legislature); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997) (in assessing motion to dismiss, court can look at "documents either attached to or incorporated [by reference] in the complaint").  The resolution declares that "[t]he Crow Tribal Legislature protests the attempted waivers and releases of claims," which "have absolutely no validity, weight, or bearing whatsoever to the Crow Tribal Legislature."  Resolution of Crow

Tribal Legislature at 2.  It then provides that "no future waivers or releases of Crow tribal claims shall be authorized or considered authorized when signed by a single Crow tribal member, even if the Executive Branch Chairman, unless specific Crow tribal constitutional authority or tribal statutory authority can be cited … [and] that absolutely no waivers or releases of Crow tribal rights and claims shall be considered unless proposed Settlement terms are fully reviewed and deliberated by the Crow Tribal Legislature and the Crow Tribal General Council."  Id. at 3. Even if that resolution could bind Interior, however, Plaintiffs are out of luck because it says nothing about who has the authority to agree to a deadline extension on behalf of the "the Tribe" pursuant to the Settlement Act — let alone that the Secretary can lawfully publish the statement of findings on a date agreed to only by the entire Council, instead of just the Chairman.  So much for Plaintiffs' late-breaking characterization of Count I, which does not survive in any form.

> b.   Premature Publication

Count II — both as pled in the operative Complaint and as construed in the Opposition — targets the Secretary's publication of the statement of findings head on.  See Am. Compl., ¶¶ 192–96.  Specifically, Plaintiffs take issue with Haaland's finding that "[t]he Montana Water Court ha[d] issued a final judgment and decree approving the Compact."  81 Fed. Reg. at 40,720. That finding, they posit, was premature "because the appeal of Crow Allottees Association v. BIA challenging the jurisdiction of the Montana Water Court" was not yet concluded.  See Am. Compl., ¶ 195.  Plaintiffs acknowledge that the Montana Water Court had issued a judgment and decree approving the Compact and that the direct appeal to the Montana Supreme Court had been completed.  Id., ¶ 167.  In Allottees' eyes, however, the pendency of the action in federal court nonetheless rendered the Montana Water Court's judgment and decree nonfinal at the time. Id., ¶¶ 193–95 (citing Settlement Act § 403(7)(B)).  To again put it in APA lingo, the claim

seems to be that the Secretary's finding was premature under the Settlement Act and thus not in accordance with law.  See 5 U.S.C. § 706(2).

Whether this count survives the Motion to Dismiss boils down to a question of statutory interpretation about when the Montana Water Court's judgment and decree became "final."  The dispute hinges on the combined meaning of two disjunctive provisions in the Settlement Act: section 410(e)(1)(A) and section 403(7).  The former establishes that the Secretary must find in her statement of findings, among other things, that:

> (i) the Montana Water Court has issued a final judgment and decree approving the Compact; or
>
> (ii) if the Montana Water Court is found to lack jurisdiction, the district court of jurisdiction has approved the Compact as a consent decree and such approval is final[.]

Settlement Act § 410(e)(1)(A).  The latter, in turn, defines "final" for purposes of "approval of the decree described in section 410(e)(1)(A)" to mean:

> (A) completion of any direct appeal to the Montana Supreme Court of a decree by the Montana Water Court pursuant to section 85–2– 235 of the Montana Code Annotated (2009), including the expiration of time for filing of any such appeal; or
>
> (B) completion of any appeal to the appropriate United States Court of Appeals, including the expiration of time in which a petition for certiorari may be filed in the United States Supreme Court, denial of such petition, or issuance of a final judgment of the United States Supreme Court, whichever occurs last.

Settlement Act § 403(7).

The parties agree that under section 401(e)(1)(A), the Secretary need not find both that "the Montana Water Court has issued a final judgment and decree approving the Compact" and that "the district court of jurisdiction has approved the Compact as a consent decree and such approval is final."  Id. § 410(e)(1)(A).  Rather, it is sufficient for her to find either that "the Montana Water Court has issued a final judgment and decree approving the Compact" or — in

the event that "the Montana Water Court is found to lack jurisdiction" — that "the district court

of jurisdiction has approved the Compact as a consent decree and such approval is final." Id.

That is, after all, what "or" means.  But the parties differ on the following: if the Montana Water

Court issues a judgment and decree approving the Compact, how does the Secretary assess

whether that judgment and decree is "final" under section 403(7)?

Plaintiffs say that the phrase "whichever occurs last" in section 403(7)(B) instructs the

Secretary to wait for the events described in section 403(7)(A) and the events described in

section 403(7)(B) to occur so that she can determine which set of events "occurs last."  See Opp.

at 20.  Only when both have occurred, Allottees assert, can the Secretary make that decision.

Here, Plaintiffs maintain, the events in section 403(7)(B) "occurred last" because the

expiration of the time in which a petition for certiorari could be filed in Crow Allottees Ass'n v.

Bureau of Indian Affairs occurred after the completion of the direct appeal of the Montana Water

Court's judgment and decree to the Montana Supreme Court.  Therefore, Plaintiffs insist that

Montana Water Court's judgment and decree was not "final" until September 27, 2017, when the

time in which a petition for certiorari could be filed in Crow Allottees Ass'n v. Bureau of Indian

Affairs expired — which was after the Secretary published her findings.  Id. at 20.

The Government disagrees.  It says that the Secretary need not wait for all the events

described in sections 403(7)(A) and 403(7)(B) to occur before finding the Montana Water

Court's decree to be "final."  Rather, as the Government reads the Act, the disjunctive definitions

of "final" in section 403(7)(A) and section 403(7)(B) map onto the disjunctive conditions in

section 410(e)(1)(A)(i) and section 410(e)(1)(A)(ii), respectively.  See MTD at 23–25; Reply at

10–11.  To spell that out: if the Montana Water Court issues a judgment and decree approving

the Compact (as contemplated in section 410(e)(1)(A)(i)), the Montana Water Court's judgment

and decree becomes "final" once any direct appeal of the judgment and decree to the Montana Supreme Court is completed, per section 403(7)(A).  Alternatively, if the Montana Water Court is found to lack jurisdiction and the district court of jurisdiction approves the Compact as a consent decree (as contemplated in 410(e)(1)(A)(ii)), the district court's decree becomes "final" once any appeal to the appropriate federal court of appeals (or the Supreme Court) is completed, per section 403(7)(B).

Under Defendants' reading, because the Montana Water Court issued a judgment and decree approving the Compact and was never found to lack jurisdiction, the only applicable definition of "final" is the one in section 403(7)(A), not section 403(7)(B).  See MTD at 25 (contending that "[t]he second definition of finality is plainly tied to the alternative finality provision in 410(e)(1)(A)(ii), contemplating federal district court approval of the Compact as a consent decree, if and only if, the Montana Water Court was found to lack jurisdiction, in which case a United States Court of Appeal may have some role").  Defendants thus assert that the Montana Water Court's "judgment and decree approving the Compact" became "final" as soon as the "direct appeal to the Montana Supreme Court of a decree by the Montana Water Court pursuant to section 85–2–235 of the Montana Code Annotated (2009), including the expiration of time for filing of any such appeal," was complete.  See MTD at 23–25; Reply at 10–11.  That was before the Secretary published her findings.

A careful analysis of the statutory language reveals that the Government has the better reading.  To start, the phrase "whichever occurs last" is not offset from section 403(7)(B) as flush language but rather appears as part of that subsection, immediately following a list of possible steps that could occur after a decision by "the appropriate United States Court of Appeals" — i.e., filing of a petition for certiorari, denial of a petition for certiorari, or the

Supreme Court's issuance of a final judgment.  Generally, "[q]ualifying words or phrases" —
like "whichever occurs last" — "modify the words or phrases immediately preceding them and
not words or phrases more remote, unless the extension is necessary from the context or the spirit
of the entire writing."  Lockhart v. United States, 577 U.S. 347, 351 (2016) (quoting A. Scalia &
B. Garner, Reading Law: The Interpretation of Legal Texts 144 (2012)).

      Not only do Allottees fail to offer any reason to read "whichever occurs last" to modify a
remote section — viz., section 403(7)(A) — in which it does not appear, but they would face an
uphill battle even if they did because it makes perfect sense to read the phrase "whichever occurs
last" to modify the list immediately preceding it in section 403(7)(B).  The idea is this: in the
event the Montana Water Court is found to lack jurisdiction and the district court with
jurisdiction approves the Compact, the Secretary looks to section 403(7)(B) to determine when
that approval is final and uses either the date of the filing of a petition for certiorari, denial of a
petition for certiorari, or the Supreme Court's issuance of a final judgment.  Which of those dates
does she use as the date on which the district court's approval becomes final?  Whichever occurs
last.

      In addition to running roughshod over principles of statutory interpretation, Plaintiffs'
reading would rewrite the disjunctive definition of "final" in section 403(7) by transforming it
into a conjunctive.  That is, it would require the Secretary to wait for both "completion of any
direct appeal to the Montana Supreme Court of a decree by the Montana Water Court . . . ,
including the expiration of time for filing of any such appeal" and "completion of any appeal to
the appropriate United States Court of Appeals, including the expiration of time in which a
petition for certiorari may be filed in the United States Supreme Court, denial of such petition, or
issuance of a final judgment of the United States Supreme Court" in order to see "which[] occurs

last."  Settlement Act § 403(7)(A), (B).  But the Act says "or," not "and," and there is no dispute

here that "or" means "or."  (The Court will happily leave harder, contested questions about

disjunctives and conjunctives to those of nimbler mind.  Cf. Pulsifer v. United States, No. 22-340

(U.S.).)  What is more, Congress's use of "or" here is for good reason: as the Government

observes, "It would make no sense to require a decision from a U.S. Court of Appeals to finalize

a decision made by a court, such as the Montana Water Court, whose decisions it has no

jurisdiction to review."  Reply at 11 (citing 28 U.S.C. §§ 1291, 1292, 1296).  Plaintiffs' reading

would give any challenging party the ability to game the date of finality via the timing of a

collateral challenge in federal court to the Montana Water Court's jurisdiction.

     Properly construed, therefore, the Settlement Act did not require the appeal in Crow

Allottees Ass'n v. BIA to be completed for the Montana Water Court's judgment and decree

approving the Compact to be final.  Rather, that judgment and decree became final once its direct

appeal was completed, which Plaintiffs admit was before the Secretary's publication of the

statement of findings.  See Settlement Act § 403(7)(A).  The Court thus agrees with Defendants

that it is clear on the face of the Amended Complaint that, even accepting all facts pled as true,

Allottees have failed to allege that the Secretary's publication of the statement of findings was

premature.  Count II will, accordingly, meet the same fate as Count I.

     2.   *Breach of Trust*

     That brings us to Count III, in which Plaintiffs assert that the Government violated its

trust responsibilities to protect their Winters water rights.  See Am. Compl., ¶¶ 197–209.

Defendants contend that this count is faulty because Allottees have not identified a treaty, statute,

or regulation that establishes a specific trust duty that Defendants allegedly neglected to perform.

See MTD at 25–28.  They are correct.

It is clear that "[t]he trust obligations of the United States to the Indian tribes are established and governed by statute rather than the common law." United States v. Jicarilla Apache Nation, 564 U.S. 162, 165 (2011).  That is because "[t]he Federal Government owes judicially enforceable duties to a tribe 'only to the extent it expressly accepts those responsibilities.'"  Navajo Nation II, 599 U.S. at 564 (quoting Jicarilla, 564 U.S. at 177). "Whether the Government has expressly accepted such obligations" thus "'must train on specific rights-creating or duty-imposing' language in a treaty, statute, or regulation."  Id. (quoting United States v. Navajo Nation (Navajo Nation I), 537 U.S. 488, 506 (2003)).  To bring a breach-of-trust claim, accordingly, Plaintiffs "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties."  Navajo Nation I, 537 U.S. at 506; see also Navajo Nation II, 599 U.S. at 563–64 (plaintiffs "must establish, among other things, that the text of a treaty, statute, or regulation imposed certain duties on the United States" that it violated).

Plaintiffs stumble out of the gate by declining to identify in their Amended Complaint a substantive source of law — e.g., a treaty, statute, or regulation — that establishes a specific trust duty that they believe Defendants violated.  Instead, they try to ground their breach-of-trust claim in the common law, alleging that the Government ran afoul of its "common law fiduciary duties of the Defendants to protect the Plaintiffs' water rights."  Am. Compl., ¶ 206; see id., ¶ 200 (asserting that "[t]he United States has a common law fiduciary duty to identify the Winters Doctrine water rights appurtenant to each of the Plaintiffs' and other Allottees' individual Indian trust allotments on the Crow Reservation").  As the Government explains, however, "[c]ommon-law principles are relevant only when applied to a 'specific, applicable, trust-creating statute or regulation.'"  Jicarilla, 564 U.S. at 184 (citation omitted); see MTD at 27.

Still not keen to abide by the <u>Jicarilla</u> framework, Plaintiffs spill much ink in their Opposition explaining that "[t]he existence of a general trust relationship between the United States and Indian tribes was recognized by the Supreme Court in its foundational cases establishing the doctrinal contours of federal Indian law." Opp. at 21. True, the United States "maintains a general trust relationship with Indian tribes." <u>Navajo Nation II</u>, 599 U.S. at 565. But that does not get Allottees home under <u>Jicarilla</u> and its progeny.

The Supreme Court has explained that because "the United States is a sovereign, not a private trustee, . . . 'Congress may style its relations with the Indians a trust without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is limited or bare compared to a trust relationship between private parties at common law.'" <u>Id.</u> at 565–66 (quoting <u>Jicarilla</u>, 564 U.S. at 174). Courts thus "'apply common-law trust principles' to infer duties not found in the text of a treaty, statute, or regulation" only if "Congress has created a conventional trust relationship with a tribe as to a particular trust asset." <u>Id.</u> at 566 (quoting <u>Jicarilla</u>, 564 U.S. at 178).

For example, in <u>United States v. Mitchell</u>, 463 U.S. 206 (1983), the Supreme Court noted that its "construction of [certain] statutes and regulations [was] <u>reinforced</u> by the undisputed existence of a general trust relationship between the United States and the Indian people." <u>Id.</u> at 225 (emphasis added). That was because the <u>Mitchell</u> plaintiffs, unlike Plaintiffs here, identified specific statutory and regulatory provisions that established fiduciary obligations of the Government in the management and operation of Indian lands and resources in the first place. <u>Contra</u> Opp. at 27 (insisting that "careful analysis" of <u>Mitchell</u> "reveals that the Court actually does deem certain fiduciary responsibilities to flow from common law understandings adherent to the trust obligation itself"). Simply pointing to the existence of a general trust relationship

will not do.  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 255 F. Supp. 3d 101, 144

(D.D.C. 2017).

      Trying a different tack, Plaintiffs posit that the requirements of Jicarilla and related cases

apply only to suits for money damages brought under the Indian Tucker Act in the Court of

Federal Claims, not their claim for equitable relief here.  See Opp. at 24–25; see also id. at 28

("It is only in the assessment of whether the government has waived its sovereign immunity in

monetary damages claims before the Court of Claims that the existence of the trust obligation

itself must be specifically established as based in treaty, statute or agency regulation.").  For

support, they rely on Justice Gorsuch's dissent in Navajo Nation II.  See Opp. at 25.  That

dissent, however, was a dissent for a reason: the majority rejected the argument that "the Jicarilla

line of cases might apply only in the context of claims seeking damages from the United States

pursuant to the Tucker Act and Indian Tucker Act."  Navajo Nation II, 599 U.S. at 564 n.1.  It

explained:

> Jicarilla's framework for determining the trust obligations of the
> United States applies to any claim seeking to impose trust duties on
> the United States, including claims seeking equitable relief.  That is
> because Jicarilla's reasoning rests upon separation of powers
> principles — not on the particulars of the Tucker Acts.  As Jicarilla
> explains, the United States is a sovereign, not a private trustee, and
> therefore the trust obligations of the United States to the Indian
> tribes are established and governed by treaty, statute, or regulation,
> rather than by the common law of trusts.  Stated otherwise, the trust
> obligations of the United States to the Indian tribes are established
> by Congress and the Executive, not created by the Judiciary.

Id. (internal citation omitted); see also El Paso Natural Gas Co., 750 F.3d at 399–400 (rejecting

similar argument before Navajo Nation II); Standing Rock, 255 F. Supp. 3d at 145 (same).

      Perhaps realizing their attempts to sidestep binding Supreme Court precedent will not

prove fruitful, Allottees rejoin that they can, in fact, satisfy the Jicarilla framework and cite

sources of law attempting to do so.  See Opp. at 25–29.  This is a more promising alley, but it ultimately meets a dead end: some of the sources of law Plaintiffs cite are irrelevant to the case at hand, while the rest do not create trust duties that they plausibly allege Defendants violated here.

Start with the scattershot citations to: 25 U.S.C. §§ 349, 382, 385, 386, 386a, 404; 25 C.F.R. §§ 171.105, 171.110, 2530.0–8.  See Opp. at 28–29 & nn.5–6.  Those statutory and regulatory provisions, however, appear nowhere in the entirety of Allottees' 63-page Amended Complaint, and the Court does not see — nor do Plaintiffs explain — how they apply here, let alone impose enforceable trust duties on the Government.  Some concern irrigation projects and whether the costs of such projects are reimbursable, while others concern allotments and allottees generally, but none helps Allottees make out their breach-of-trust claim.

Next, Plaintiffs cite 25 U.S.C § 381, which provides: "In cases where the use of water for irrigation is necessary to render the lands within any Indian reservation available for agricultural purposes, the Secretary of the Interior is authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservations . . . ."  That provision is, as the Government acknowledges, "at least relevant to administration of allottee water rights."  Reply at 16; see also Settlement Act § 407(d)(1) (specifying that 25 U.S.C. § 381 "shall apply").  And it appears in the Amended Complaint, albeit in the introduction.  See Am. Compl., ¶ 13 & n.3.  But Defendants are correct that it is unclear that the Secretary's authority to prescribe regulations creates a duty to do so, and, in any event, Allottees do not allege that the trust duty violated here was the Secretary's duty to prescribe regulations pursuant to 25 U.S.C. § 381.  Nor could they; the Secretary has prescribed such regulations, see 25 C.F.R. pt. 171, which both parties cite.  See, e.g., Opp. at 28–29 & nn.5–6; Reply at 16.

That leaves Plaintiffs with one final source of law: the Settlement Act itself.  See Opp. at 23.  Echoing the Compact, the Act states: "The tribal water rights — (1) shall be held in trust by the United States for the use and benefit of the Tribe and the allottees in accordance with this section; and (2) shall not be subject to forfeiture or abandonment."  Settlement Act § 407(c).  Even that trust-creating language cannot save Count III, however, because Allottees have not adequately alleged that Defendants violated any trust duties established in the Act.

As best the Court can tell, the Amended Complaint asserts that the Government breached its trust-responsibility obligations in three ways: (1) by failing to "determine the extent" of Plaintiffs' Winters rights and to "assert those rights in the Crow water rights adjudication before the [Montana Water Court]," Am. Compl., ¶¶ 199, 200–201; (2) by acting as Allottees' trustee in negotiations "without adequate notice to the Plaintiffs[] and other Allottees, without their participation in negotiations, and without their consent"; id., ¶¶ 199, 207; and (3) by publishing the statement of findings "seeking to extinguish or diminish the Plaintiffs' Winters Doctrine water rights in the absence of [a Current Use List] and the Crow Tribal Water Code."  Id., ¶ 206.

Plaintiffs' Opposition, however, narrows that list.  In it, Allottees clarify that they are "NOT seek[ing] remedies for" the Government's actions in the Compact "negotiations or the prior litigation in the Montana Water Court.  Those allegations are merely part of the background of the case."  Opp. at 32.  That takes (1) and (2) — which, the Court notes, have already been litigated in the Ninth Circuit — off the table, leaving only (3) — viz., the Secretary's publication of the statement of findings in the absence of a Current Use List and Tribal Water Code.  See Am. Compl., ¶¶ 197–209.  Plaintiffs' theory seems to be that to fulfill its trustee duties as established by section 305(a) of the Settlement Act, Interior needed to ensure that a Tribal Water Code and Current Use List existed before publishing the statement of findings in the Federal

Register.  See Opp. at 32 ("The focus in this suit, as indicated throughout this document and the Amended Complaint, is on the untimely publication of the [statement of findings] and steps Interior was required to complete prior to its publication.").

That theory is unavailing.  As the Government points out, and Plaintiffs acknowledge, the Settlement Act itself mandated publication of the statement of findings.  See Reply at 15; see also Opp. at 19 (acknowledging that "publication of the [statement of findings] in the manner and time frame under the Act was a clear and mandatory directive under the Act").  And, as Allottees themselves admit, nowhere does the Settlement Act provide that the creation of the Tribal Water Code or preparation of a Current Use List are prerequisites for the publication of the statement of findings.  See Opp. at 42.  The Court is skeptical, moreover, that an agency action required by one provision of a statute can constitute a violation of the trust responsibility allegedly established by another provision of that very same statute.  At least, Plaintiffs have not adequately alleged that Defendants committed such a violation here.

One final point bears mention.  Based on the briefing, it is unclear whether Plaintiffs are trying to argue that the United States' alleged failure to act in accordance with its trust-responsibility obligations violated the APA — *e.g.*, by rendering Interior's publication of the statement of findings arbitrary and capricious or contrary to law — or whether they solely intend to maintain a breach-of-trust claim under a cause of action inferred from the fiduciary responsibilities allegedly undertaken by the Government.  Compare Am. Compl., ¶ 209 (alleging both "a violation of the common law fiduciary duties owed by the Defendants to the Plaintiffs" and "a violation of the APA" in Count III), and Opp. at 24 (mentioning that "jurisdiction and U.S. waiver of sovereign immunity" for this count "are premised on the APA"); with Opp. at 15

(referring separately to "Plaintiffs' APA and breach of fiduciary duty claims"), and Opp. at 21–33 (no mention of any APA provision in defending Count III).

The Court need not concern itself with trying to muddle through that confusion, however, because regardless of how they conceive of their cause of action, Allottees' position "comes up short for the same reason."  Standing Rock, 255 F. Supp. 3d at 143 (rejecting plaintiffs' position regardless of whether claim is maintained under only APA or also under cause of action inferred from fiduciary responsibilities); El Paso Natural Gas Co., 750 F.3d at 892 (similar in case where plaintiff "appear[ed] to argue that its claim can be maintained either (1) under the APA or (2) under a cause of action inferred from the fiduciary responsibilities undertaken by the Government").  Because Plaintiffs have not identified a specific provision creating trust duties that they plausibly allege Defendants violated, Count III — whether considered as part of a larger APA cause of action or separately — is infirm.

3.  *Fifth Amendment*

Allottees last maintain in Count IV that the Government violated the Due Process Clause of the Fifth Amendment by depriving them of their rights to procedural and substantive due process and equal protection of the laws.  See Am. Compl., ¶¶ 210–14.  Not wanting to put all their due-process eggs in one basket, Plaintiffs seem to claim that both the Secretary's publication of the statement of findings and the Settlement Act itself violated those rights. Compare id., ¶ 213 (alleging that "[t]he publication of the 2010 Crow Settlement Act Enforceability Date in the Federal Register on June 22, 2016," violated the Fifth Amendment); Opp. at 41 (asserting that "the Secretary's publication of the Enforcement Date is unconstitutional as applied because it violates the Fifth Amendment"), with Am. Compl., ¶ 2

(alleging that "[t]he Act violates the Plaintiffs' Fifth Amendment"); Am. Compl., ¶¶ 31, 113 (similar); Opp. at 38 (similar).

Perhaps recognizing that any facial challenge to the Settlement Act would be barred by the six-year statute of limitations, see Neighbors of Casino San Pablo v. Salazar, 442 F. App'x 579, 580 (D.C. Cir. 2011) (citing 28 U.S.C. § 2401(a)), Allottees insist that they are "challenging the constitutionality of the Act as it is applied to them." Opp. at 38 (emphasis added). It is difficult to reconcile that insistence with the remedy they seek: not an injunction preventing enforcement of the Settlement Act against them, but a declaration that the Act is void and unenforceable, full stop. See Citizens United v. FEC, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."); see also Reply at 19 (making this point). Regardless of the distinction between facial and as-applied challenges, though, "[t]he substantive rule of law is the same," so the Court will assume for purposes of its analysis that Plaintiffs in fact bring an as-applied challenge to the Act and that it is not time barred. Edwards v. Dist. of Columbia, 755 F.3d 996, 1001 (D.C. Cir. 2014); cf. Schubarth v. Fed. Republic of Germany, 2020 WL 13065292, at *4 (D.D.C. Mar. 12, 2020) ("The timeliness of a claim is a nonjurisdictional threshold requirement.") (cleaned up) (quoting Matar v. Transp. Sec. Admin., 910 F.3d 538, 541 (D.C. Cir. 2018)).

To make matters a bit more complicated, Plaintiffs at several points drop clues that they are also bringing a claim under the Takings Clause. For instance, as a basis for venue, they cite the Little Tucker Act, see Am. Compl., ¶ 40, which provides a remedy for takings. Cf. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1019 (1984); see also, e.g., Opp. at 33 (asserting that "[t]his litigation is on all fours with" two takings cases); Opp. at 35–37 (invoking two more

takings cases).  Yet their Opposition states decisively that "[t]his litigation does not seek compensation for a taking."  Opp. at 33.  The Court will, therefore, take Allottees at their word and not dip its toe into the takings pond.

That leaves the analysis of whether they have sufficiently alleged a violation of (a) procedural due process, (b) substantive due process, or (c) equal protection.  The Government contends that regardless of whether Plaintiffs are bringing a challenge to the publication of the statement of findings or to the Settlement Act itself — or both — their allegations are lacking.  See MTD at 30–32; Reply at 17–21.  The Court marches through each legal doctrine.

    a.  Procedural Due Process

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause[.]"  Mathews v. Eldridge, 424 U.S. 319, 332 (1976).  To state a claim for the denial of procedural due process, a plaintiff must allege that the government deprived her of a "'liberty or property interest' to which she had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that deprivation were constitutionally [in]sufficient.'"  Roberts v. United States, 741 F.3d 152, 161 (D.C. Cir. 2014) (alteration in original) (quoting Ky. Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).  The "basic requirements" of any such procedures are "notice and an opportunity to be heard."  English v. Dist. of Columbia, 717 F.3d 968, 972 (D.C. Cir. 2013).

The Government wisely does not dispute that Plaintiffs have alleged a deprivation of "property interest[s]" within the meaning of the Due Process Clause.  See Am. Compl., ¶ 213 (alleging deprivation of "valuable and marketable real property Winters Doctrine water rights").  Rather, they point out other respects in which this claim is deficient — namely, that the operative Complaint is lacking in facts that, if accepted as true, would indicate that Plaintiffs were denied

either "notice" or "an opportunity to be heard" before the enactment of the Settlement Act or before the Secretary's publication of the statement of findings.  English, 717 F.3d at 972.

To be sure, Allottees assert in a conclusory fashion that they were deprived of "notice." Am. Compl., ¶ 213.  But, as the Government observes, their allegations indicate that they were, in fact, on notice when Congress enacted the Settlement Act in 2010 that certain waivers and releases affecting their Winters water rights would go into effect on the enforceability date, see Am. Compl., ¶¶ 16, 18, 130–31; that the enforceability date would be the date the Secretary published the statement of findings, id., ¶¶ 16, 119, 147; and that the Secretary would publish the statement of findings by March 31, 2016, or some later date agreed to by the Tribe and the Secretary.  Id. ¶¶ 110, 112–13, 119–20, 149–50; see Settlement Act § 415.

With respect to an opportunity to be heard, all Plaintiffs allege is that the Government excluded them from the Compact negotiations more than twenty years ago.  See, e.g., Am. Compl., ¶ 83.  By Allottees' own admission, however, they are not challenging the Government's actions in those negotiations.  See Opp. at 32.  Insofar as they are claiming that they were entitled to an opportunity to be heard after the negotiations and either before the Settlement Act was enacted or before the Secretary published her statement of findings, they do not offer any reason for this Court to depart from the Ninth Circuit's conclusion in a similar context that "the legislative process was the only process to which Plaintiffs were entitled." Crow Allottees Ass'n, 705 F. App'x at 492 (citing Minn. State Bd. for Cmty. Colls. v. Knight, 465 U.S. 271, 283 (1984)).  Nor do they so much as "identify the process that [was] due" to them with respect to either the enactment of the Settlement Act or the Secretary's publication of the statement of findings.  Doe ex rel. Fein v. Dist. of Columbia, 93 F.3d 861, 870 (D.C. Cir. 1996).

          b.   Substantive Due Process

Next up is substantive due process, a doctrine that generally prohibits only government "actions that in their totality are genuinely drastic," <u>Tri Cnty. Indus., Inc. v. Dist. of Columbia</u>, 104 F.3d 455, 459 (D.C. Cir. 1997), because it "constrains only egregious government misconduct." <u>George Washington Univ. v. Dist. of Columbia</u>, 318 F.3d 203, 209 (D.C. Cir. 2003). When considering whether an allegation rises to this level, a court should keep in mind the traditional "reluctan[ce] to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." <u>Collins v. City of Harker Heights</u>, 503 U.S. 115, 125 (1992). To ensure claims remain within these parameters, the threshold question is whether the challenged actions may "fairly be said to shock the contemporary conscience." <u>Est. of Phillips</u>, 455 F.3d 397, 403 (D.C. Cir. 2006) (quoting <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 847 n. 8 (1998)).

Plaintiffs do not allege a deprivation that could possibly be said to "shock the contemporary conscience." <u>Est. of Phillips</u>, 455 F.3d at 403 (citation omitted). Instead, Allottees essentially complain only of "the lack of process [they] received, which is duplicative of [their] procedural due process claim." <u>Hurd v. Dist. of Columbia</u>, 2023 WL 4744056, at *17 (D.D.C. July 25, 2023); <u>see, e.g.</u>, Am. Compl., ¶ 213. As another court in the District explained when a plaintiff similarly tried to trojan-horse a procedural-due-process claim into a substantive-due-process one, "A substantive due process claim is not the proper vehicle for such a grievance because substantive due process 'bars certain arbitrary, wrongful government actions "<u>regardless of the fairness of the procedures used to implement them</u>."'" <u>Hurd</u>, 2023 WL 4744056, at *17 (quoting <u>Zinermon v. Burch</u>, 494 U.S. 113, 125 (1990)).

In order "[t]o make out a colorable substantive due process claim," Allottees would have to allege that some aspect of Defendants' actions "beyond the lack of process 'shocked the conscience' and accordingly violated [their] constitutional rights." Id.; see also Gonzalez-Fuentes v. Molina, 607 F.3d 864, 880 (1st Cir. 2010) ("The substantive component of due process protects against certain government actions regardless of the fairness of the procedures used to implement them. Thus, unlike a procedural due process claim, this challenge requires us to assess the constitutionality of the deprivation itself.") (internal quotation marks and citation omitted). Plaintiffs plainly do not meet this pleading hurdle.

> c. Equal Protection

Last up: equal protection. The Fifth Amendment's guarantee of equal protection mirrors that provided by the Fourteenth Amendment. Johnson v. Robison, 415 U.S. 361, 364 n.4 (1974); see Fraternal Order of Police v. United States, 152 F.3d 998, 1002 (D.C. Cir. 1998), reh'g granted on other grounds, 173 F.3d 898 (D.C. Cir. 1999) ("Equal protection analysis is substantially identical under the Fifth Amendment and the Fourteenth.").

Starting with the publication of the statement of findings, Allottees assert that "the Secretary's triggering of the Settlement Enforceability Date constitutes invidious discrimination between the Crow Indian Plaintiff individual Indian Winters doctrine water right owners and non-Indian fee owners of former Crow Reservation allotments based on a racial classification." Opp. at 41; see Am. Compl., ¶ 213; Opp. at 3. It is anyone's guess, however, how Plaintiffs think that the Secretary's publication of the statement of findings — which merely stated that seven statutory conditions were met — implicates equal protection. Allottees seem to implicitly acknowledge as much: even though they assert that the Court must "determine the constitutionality of the Secretary's implementation of the Compact and the Act," Opp. at 41, the

meat of their argument is about how the Court should determine the constitutionality of the Act itself, not the Secretary's implementation thereof.  Id. at 41–44.  In considering the constitutionality of the Settlement Act, Plaintiff's allegation — even more than the preceding challenges — appears as a facial challenge, which would be time barred.  The Court will nonetheless consider the merits.

To start, Allottees do not allege any facts showing that the Department of the Interior, Haaland, or Newland is responsible for an equal-protection violation allegedly effected by Congress.  But even aside from that difficulty, further problems abound.  Plaintiffs' preliminary assertion that the Court must apply strict scrutiny to the Settlement Act, id. at 41, can be easily dispensed with.  Even if they are correct that the Act draws distinctions between Indians and non-Indians, the Supreme Court has long held that such classifications, at least in these circumstances, are not subject to that level of scrutiny.  See Morton v. Mancari, 417 U.S. 535, 555 (1974) ("As long as the special treatment [of Indians] can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed."); Washington v. Confederated Bands & Tribes of Yakima Indian Nation, 439 U.S. 463, 500–01 (1979) (similar); Del. Tribal Bus. Comm. v. Weeks, 430 U.S. 73, 84–85 (1977) (similar); see also Reply at 19–20 (invoking this line of cases).  Summarizing that caselaw, the D.C. Circuit has explained that "ordinary rational basis scrutiny applies to Indian classifications just as it does to other non-suspect classifications under equal protection analysis."  Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n, 158 F.3d 1335, 1340 (D.C. Cir. 1998); see also Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 330 F.3d 513, 520 (D.C. Cir. 2003); Muwekma Ohlone Tribe v. Salazar, 708 F.3d 209, 215 (D.C. Cir. 2013).

Because rational-basis review applies, Allottees "must plausibly allege facts showing that no reasonably conceivable state of facts could provide a rational basis for the challenged policy." Sanchez v. Off. of State Superintendent of Educ., 45 F.4th 388, 396 (D.C. Cir. 2022).  Here, that means they "must allege facts sufficient to overcome the presumption of rationality that applies to government classifications" and "offer more than a conclusory assertion that the policy is without rational basis."  Dixon v. Dist. of Columbia, 666 F.3d 1337, 1342 (D.C. Cir. 2011) (internal quotation marks and citation omitted).  "That is a tall task, but not an impossible one." Sanchez, 45 F.4th at 396.

Plaintiffs' contentions, however, do not measure up.  In mounting their equal-protection claim, they insist that the Act lacks even a rational basis because "[w]hile it waives and releases the Plaintiffs' Winters doctrine water rights as against all the world, it provides them with no benefits, directly to the individual Plaintiffs as offsetting value for the loss of their individual Winters doctrine water rights, or indirectly by way of the 'benefits' touted by Interior."  Opp. at 42.  And they offer a plethora of reasons for thinking that the Settlement Act is poor legislation or has been poorly implemented.  Id. at 42–43.

Yet the Court's role "is not to assess the wisdom of" the Settlement Act, but only to assess whether Plaintiffs have met their pleading burden to "show[] that no reasonably conceivable state of facts could provide a rational basis for the challenged policy."  Sanchez, 45 F.4th at 396, 398.  After all, "[r]ational-basis review affords the policy choices of the political branches 'a strong presumption of validity.'"  Id. at 395 (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314–15 (1993)).  That means that "[j]udicial intervention under that standard is generally unwarranted no matter how unwisely . . . a political branch has acted."  Id. at 396 (internal quotation marks and citation omitted).

Congress's decision to distinguish between the Tribal Water Right and water rights recognized under state law in the Settlement Act readily survives rational-basis review. The Government explains that decision "was necessary to settle claims between holders of those rights, and thus rationally related to fulfilling Congress' 'unique obligation' to the Crow Tribe and tribal members." Reply at 20. Plaintiffs have failed to plead facts that "negative" that "conceivable basis" or otherwise "show[] that no reasonably conceivable state of facts could provide a rational basis" for the Act's treatment of allottees. Sanchez, 45 F.4th at 396.

*     *     *

In sum, Plaintiffs have not alleged facts adequate to convince the Court that any of their Fifth Amendment claims — whether construed as challenges to the Secretary's publication of the statement of findings or as non-time-barred challenges to the Settlement Act itself — are conceivable, let alone sufficient to "[]cross the line from conceivable to plausible." Twombly, 550 U.S. at 570. As a result, Count IV, like the others, will be dismissed.

## IV.     Conclusion

For the foregoing reasons, the Court will grant Defendants' Motions to Dismiss. A separate Order to that effect will issue this day.

/s/ James E. Boasberg<br>JAMES E. BOASBERG<br>Chief Judge

Date:  October 19, 2023